110 S.E.2d 739 (1959)
Hazel Mae LUCYK
v.
Kirby L. BRAWNER et al.
No. 11046.
Supreme Court of Appeals of West Virginia.
Submitted September 15, 1959.
Decided November 3, 1959.
*740 Clark B. Frame, Morgantown, for plaintiff in error.
Oakley J. Hopkins, Morgantown, for defendants in error.
BROWNING, Judge.
Hazel Mae Lucyk instituted this proceeding in habeas corpus in the Circuit Court of Monongalia County on May 23, 1958, seeking to regain the legal custody of her illegitimate, two year old son Bobby. The respondents are Kirby L. Brawner, Welfare Consultant for Monongalia County Circuit Court, and Neil and Margaret Riffle, husband and wife, to whom the physical custody of Bobby was given by Mrs. Brawner. The parties will be designated Lucyk, Brawner and Riffles in this opinion.
After a hearing, the trial court quashed the writ of habeas corpus theretofore awarded and awarded the custody of Bobby to the Riffles, to which action this Court granted a writ of error on February 2, 1959.
The pertinent evidence is substantially as follows: Lucyk was previously married to a man named Sheets by whom she had five children and from whom she was separated in 1952 or 1953, leaving the children then at home in their father's care. She became a resident of Morgantown, Monongalia County, West Virginia, and on March 9, 1955, gave birth to a daughter Bernadine. Subsequently, on June 25, 1956, she gave birth to a son Bobby, the infant whose custody is sought to be regained in the instant proceeding. Her marriage to Sheets was not ended by divorce until May 28, 1957, though by her own admission Sheets is not the father of either Bernadine or Bobby. Lucyk apparently kept both children in her home, employing a niece as a baby sitter while she worked, until October, 1957, when she placed both children *741 in the home of a Mr. and Mrs. Pomeroy. At this time, Lucyk received a salary of $25 a week as a waitress, and agreed to pay the Pomeroys $17.50 a week for room and board for each child.
On January 28, 1958, the child Bernadine was relinquished to a New Jersey couple for adoption, the necessary papers being prepared and executed in the presence of a prominent attorney of Morgantown. The record is silent as to whether Lucyk has made any effort to regain the custody of Bernadine. Shortly thereafter, in the early part of February, 1958, Brawner, in a casual conversation with Mr. Pomeroy, discovered that the Pomeroys had been keeping the two children for Lucyk, and that Lucyk had permitted a New Jersey couple to adopt Bernadine. Brawner then went to see Mrs. Pomeroy and Bobby, and later requested an investigator of the prosecuting attorney's office to ask Lucyk to come into her office in the courthouse. Lucyk appeared and there was a discussion between them concerning the adoption of Bernadine and the future of Bobby. Nothing was agreed upon concerning Bobby at that meeting, although the possibility of his being placed for adoption was discussed. Approximately three days later, Lucyk returned to Brawner's office and showed her a letter from the adoptive grandmother of Bernadine, which letter contained a reference to the possible adoption of Bobby. Lucyk had lost her job at this time, but still was undecided as to her future course of action concerning Bobby. Then, on February 17, 1958, Lucyk again appeared at Brawner's office and signed a paper, previously prepared by Brawner, styled: "Relinquishment of Child and Consent for Adoption.", in which she relinquished her parental rights in the child Bobby to Brawner, and purported to give Brawner full power and authority to consent to his adoption. The two last mentioned visits to Brawner's office were not in response to any summons by Brawner or any previously arranged appointment. Subsequently, on February 20, 1958, Brawner obtained Bobby from the Pomeroys and placed him in the custody of the Riffles.
On March 15, 1958, Lucyk married her present husband, Andrew Lucyk, and moved to his home in Pennsylvania. Sometime in April, 1958, she returned to Brawner's office and asked for the return of Bobby. Brawner advised her to wait, and also advised her to consult an attorney. Having discovered the whereabouts of Bobby, Lucyk went to see the Riffles, who refused to discuss the matter. She thereupon consulted an attorney and a purported repudiation of the relinquishment agreement was prepared and served upon Brawner on May 17, 1958. Shortly thereafter, the present proceeding was instituted.
There is a conflict in the evidence as to what transpired in Brawner's office at the time the relinquishment was executed. Brawner states that the paper was explained to Lucyk, was seemingly read by her, and that Lucyk fully understood the nature and consequences thereof. Lucyk contends that she was nervous and upset, without funds to support Bobby, and understood only that the execution of the paper would permit Brawner to assist her temporarily in caring for Bobby until she was in a better position financially. In this regard, Lucyk states that, at the time she executed the relinquishment, she was contemplating the marriage which subsequently took place on March 15th. The evidence also shows that, while Lucyk frequently visited Bobby while he was with the Pomeroys and provided for his needs, after signing the relinquishment on February 17, 1958, she made no further visits to him thereafter or attempted to ascertain his whereabouts until sometime in April.
There is no question but that the child was receiving excellent care while with the Pomeroys, nor is there any question but that the Riffles are suitable custodians, well able to supply his emotional and material needs. There likewise seems to be no serious contention *742 that Lucyk is not now able to provide an adequate home for Bobby with her new husband.
As heretofore mentioned, the trial court found that Lucyk had freely and voluntarily relinquished her parental right to the custody of the child; the welfare of the child would best be promoted by leaving him in his present location; and awarded custody to the Riffles, all of which is assigned as error in this Court.
Under the provisions of Code, 44-10-7, the father or the mother of a minor child is entitled to its custody and when living together the parents have equal rights to share jointly the custody of their child. While there is a conflict of authority in this country regarding the validity of an agreement by which a parent surrenders or transfers the legal right to the custody or control of his or her child to another person, 67 C.J.S. Parent and Child § 11d(1), there is no doubt that by the law of this state a parent may by fair agreement transfer or relinquish the custody of his or her infant child to another person, and such other person thereby acquires the valid and legal custody of such child. Bell v. Eicholtz, 132 W.Va. 747, 53 S.E.2d 627; State ex rel. Lipscomb v. Joplin, 131 W.Va. 302, 47 S.E.2d 221; State ex rel. Cooke v. Williams, 107 W.Va. 450, 148 S.E. 488; Fletcher v. Hickman, 50 W.Va. 244, 40 S.E. 371, 55 L.R.A. 896, 88 Am.St.Rep. 862; Cunningham v. Barnes, 37 W.Va. 746, 17 S.E. 308, 38 Am.St.Rep. 57; Green v. Campbell, 35 W.Va. 698, 14 S.E. 212.
In the early case of Cunningham v. Barnes, 37 W.Va. 746, 17 S.E. 308, Syl. Pt. 3, this Court held: "When a parent has transferred to another the custody of his infant child, by fair agreement, which has been acted on by such other person, to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless he can show that a change of custody will materially promote his child's welfare, moral and physical."
This Court has repeatedly held since its decision in Rust v. Vanvacter, 9 W.Va. 600, decided in 1876, that in a contest involving the custody of an infant the welfare of the child is of paramount and controlling importance and is the polar star by which the discretion of this Court will be guided. State ex rel. Harmon v. Utterback, W.Va., 108 S.E.2d 521; Stout v. Massie, 140 W.Va. 731, 88 S.E.2d 51; Smith v. Smith, 138 W.Va. 388, 76 S.E.2d 253; Pugh v. Pugh, 133 W.Va. 501, 56 S.E.2d 901, 15 A.L.R.2d 424; State ex rel. Lipscomb v. Joplin, 131 W.Va. 302, 47 S.E.2d 221; Pukas v. Pukas, 129 W.Va. 765, 42 S.E.2d 11; Harloe v. Harloe, 129 W.Va. 1, 38 S.E.2d 362; Suter v. Suter, 128 W.Va. 511, 37 S.E.2d 474; Frame v. Wehn, 120 W.Va. 208, 197 S.E. 524; Arnold v. Arnold, 112 W.Va. 481, 164 S.E. 850; Reynolds v. Reynolds, 109 W.Va. 513, 155 S.E. 652; State ex rel. Cooke v. Williams, 107 W.Va. 450, 148 S.E. 488; State ex rel. Palmer v. Postlethwaite, 106 W.Va. 383, 145 S.E. 738; Connor v. Harris, 100 W.Va. 313, 130 S.E. 281; Boos v. Boos, 93 W.Va. 727, 117 S.E. 616; Buseman v. Buseman, 83 W.Va. 496, 98 S.E. 574; Dawson v. Dawson, 57 W.Va. 520, 50 S.E. 613, 110 Am.St.Rep. 800; Cariens v. Cariens, 50 W.Va. 113, 40 S.E. 335, 55 L.R.A. 930; Cunningham v. Barnes, 37 W.Va. 746, 17 S.E. 308, 38 Am.St.Rep. 57; State ex rel. Neider v. Reuff, 29 W.Va. 751, 2 S.E. 801, 6 Am.St.Rep. 676.
Habeas corpus is, of course, a proper remedy by which the right to the custody of an infant child may be determined. This Court has held that in such a proceeding for that purpose the determination of the right of the parties to custody of the child lies in the sound discretion of the trial court. Stout v. Massie, 140 W.Va. 731, 88 S.E.2d 51; State ex rel. Lipscomb v. Joplin, 131 W.Va. 302, 47 S.E.2d 221. Upon a very careful review of the extensive testimony in this case by the contending parties, this *743 Court cannot say that the trial court has abused that discretion. It is true that the mother of the child is now remarried to a man living in the State of Pennsylvania, who is capable of supporting the child as well as his new wife. However, there is little evidence as to his background or the circumstances of the apparently hasty marriage between him and Lucyk. It would serve no good purpose to here dwell upon the evidence relating to Lucyk up to a very short time before this proceeding was instituted and her marriage to her present husband. Suffice to say that the judge of another circuit court saw fit to give her first husband a divorce and to give him the custody of the minor children of that marriage; that between marriages she had two illegitimate children, one of whom has been with her consent adopted by a family in the State of New Jersey; and that as of the date of the hearing insufficient time had passed for any judge to determine that the alleged reformation had effectively manifested itself. Again, upon this state of the record, we are not inclined to disturb the judgment of the Circuit Court of Monongalia County by which it refused to remove the child from where it now is and return it to the custody of its mother.
It is apparent from the record in this case that after the completion of the hearing one of the respondents, Brawner, a social welfare consultant for the trial court, prepared and submitted to the court an extensive written report upon the factual questions in issue in this proceeding. The petitioner had no opportunity to cross-examine Brawner upon the contents of this report, and in reviewing this case upon writ of error we have ignored the report and given it no consideration. Pugh v. Pugh, 133 W.Va. 501, 56 S.E.2d 901, 15 A.L.R.2d 424. However, there is an abundance of evidence in this record, exclusive of the information contained in the report, to support the judgment of the trial court.
The statutes relating to the repudiation of an agreement by a mother by which she relinquished the custody of her child are not applicable to the facts in this case. See State ex rel. Harmon v. Utterback, W. Va., 108 S.E.2d 521.
The judgment of the Circuit Court of Monongalia County will be affirmed.
Affirmed.